## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-1720

SHANNON MURPHY,

     Plaintiff,

v.

LOWES COMPANIES INC,

     Defendant

---

## COMPLAINT

---

    Plaintiff, Shannon Murphy, by and through her attorneys James W. Schmehl of the Schmehl Law Group P.C., and Kelli Riley of Riley Law LLC, hereby submits her Complaint against Defendant, Lowes Companies Inc.

## I. NATURE OF CLAIM

1.    This is a proceeding for declaratory and injunctive relief and damages to redress the deprivation of rights secured to the plaintiff by Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq.*), and to remedy a gender-based pay inequity that violates the Equal Pay Act, 29 U.S.C. § 206, and for damages for false imprisonment.. Plaintiff seeks a declaratory judgment and injunction to restrain defendant from maintaining practices, policies, customs and usages which discriminate against plaintiff and members of their class because of their sex with respect to hiring, placement, promotions and other conditions of employment.

## II. JURISDICTION AND VENUE

1.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(4) and 28 U.S.C. §§2201 and 2202. By virtue of the Court's original jurisdiction over Plaintiff's Equal Pay Act and Title VII claims, this Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 Jurisdiction to grant injunctive and declaratory equitable relief as well as damages is invoked

pursuant to 42 U.S.C. §2000e-5(f) and (g). The amount in controversy exceeds $50,000.00

## III. PARTIES

2. Plaintiff is and was a Colorado resident at all relevant times, including during the time of events described in this Complaint.

3. At all times Plaintiff was an "employee" as defined by Title VII. Defendant Lowes Companies Inc. is a company incorporated in the state of North Carolina and licensed to and doing business in the State of Colorado. At all relevant times, Defendant employed more than fifteen (15) employees, and is therefore an "employer" within the meaning of Title VII.

4. Plaintiff was an "employee" as defined by the Equal Pay Act. Defendant was an employer as defined by the Equal Pay Act.

## IV. GENERAL ALLEGATIONS

5. Plaintiff was hired for the Greeley Lowe's Store #1812 (the "Store") on or about the end of April 2015 for the position Project Specialist Interiors (PSI) for the Greeley store, and was told at the time of hire that the position kept getting delayed so Plaintiff was brought on in the Garden Center until the PSI program began.

6. The PSI position for which Plaintiff had been hired was a full-time position that came with a health insurance plan. The Garden Center position was not equal pay and had no benefits.

7. When Plaintiff was hired as a salesperson for Lowe's Project Specialist Interiors/Project Specialist Exteriors Program ("PSI/PSE Program"), the program was scheduled to launch in the store on or about April 2015, then was repeatedly delayed until October 2015.

8. Plaintiff was hired pursuant to Lowe's published Job Description and Requirements for the PSI position, which are materially identical to the Job Description and

Requirements for Lowe's PSE Position. Before Ms. Murphy applied, she was told at the time by the regional manager, Lee Ann Kimbrell, that PSE was a "guys thing," and was told not to apply for the PSE position.

9. The compensation offered to Plaintiff as a PSI included a base pay of $3,000 per month, plus 4% commissions on all products and projects including labor sold by her.

10. The start of the Program in the Store was delayed several times and Plaintiff did not officially begin work as a PSI until approximately mid to end of July 2015.

11. Because of the delayed launch, Plaintiff was assigned various other duties, such as "Garden Waterer."

12. On or about June 16, 2015 Plaintiff was required by her supervisor, Mr. Rumley, to push a self-powered pallet jack, with ten separate pallets, loaded with hundreds of pounds of materials.

13. Normally the materials on the pallet jack were moved by powered fork-lifts.

14. Due to the excessive weight of the materials, Plaintiff requested that the materials be moved with a powered fork-lift as they had been by other employees. The Supervisor of the Department, Cameron Rumley, refused her request even though powered lifts were available.

15. Mr. Rumley told Plaintiff that his sister was a weightlifter and she can do the work by hand: "So you should just suck it up."

16. Plaintiff began to feel dizzy and experienced pain in her arm while moving the heavy loads. Plaintiff told the Front Desk Manager she didn't feel well and needed to leave. She told Plaintiff she needed to "clean the bathrooms" and "throw out her garbage" which was not in Plaintiffs job description. Plaintiff threw out garbage but was getting sicker in bathroom, and asked the Front Desk Manager for the store manager. The Front Desk Manager refused to summon the store manager, so Plaintiff walked out of building.

17. The Front Desk Manager screamed at Plaintiff that she could not leave.

18. Plaintiff drove home but experienced further pain in her arm and called for an ambulance shortly after arriving home.  She was transported to the hospital and subsequently learned that she had suffered a heart attack.

19. After recovering from her heart attack, Plaintiff returned to work several days later.

20. When Plaintiff inquired about her health insurance she was told that she was not yet covered by health insurance, as the PSI/PSE Program had not officially launched in the Store. Plaintiff told Romero she was hired for that position could no longer afford to work at the substantially lower pay of a garden center waterer with no benefits. Romero stated they were starting the program early for the Greeley store and that the compensation would be changed to hourly not yet the salary.

21. Ms. Murphy applied for an emergency grant from Lowe's, with assistance from Florinda Romero, to help cover her medical expenses and mortgage.

22. Around this time, Romero informed Plaintiff that she was not entitled to the commissions she was earning, as the PSI/PSE program had not yet started in the store.

23. Ms. Romero did not file the emergency grant for several weeks.

24. Ms. Romero became evasive when asked about the grant and refused to give Plaintiff a direct answer on its status. Plaintiff contacted the corporate office in regards to the grant, and was told they had told Romero weeks prior that the grant was filled out incorrectly and she needed to reapply. Upon doing the new application, the grant was approved and payment was issued to assist Plaintiff within 48 hours.

25. In approximately July 2015, Plaintiff was moved to the PSI position for which she had been hired.

26. Beginning in July 2015, Plaintiff also performed all the duties of a PSI, and sold more than $240,000 in products before she had been employed six months. Plaintiff sold

$240,000 in products prior to Lowes paying her commissions and was actively doing the job prior to their official start date of October 1, 2015. She was only paid an hourly rate and was also sent out to residences for which she was not compensated for mileage. Lowe's eventually paid the back commissions and mileage, after Ms. Murphy complained about the back pay.

27. After the complaint about back pay, Florinda Romero was rude and hostile to Ms. Murphy.

28. Ms. Romero and In-Store Manager Sean O'Brien issued an announcement that the "garden waterer" had been promoted to PSI, not mentioning that Plaintiff had originally been hired for the position nor that she was an interior designer.

29. Plaintiff was not given an office for several months but immediately began to sell more product than most PSI's in the country.

30. In late 2015 Plaintiff was falsely accused of stealing commissions.

31. On information and belief, the investigation, came from an in-store complaint by employees that were upset they no longer received commissions.

32. Mr. O'Brien and Ms. Romero told employees Plaintiff was being investigated for theft, leading to increased workplace hostility.

33. After Plaintiff was cleared of the theft allegations, neither Mr. O'Brien nor Ms. Romero informed the general staff that Plaintiff was no longer under investigation nor that the parties that had complained were reprimanded.

34. Mr. O'Brien began to brag to all employees at daily morning meetings about how much money Plaintiff was making for Lowe's, effectively disclosing her income to all other employees and causing resentment.

35. Kitchen Designers and Installers who did not receive commissions consistently harassed plaintiff.

36. When Plaintiff brought the harassment to Mr. O'Brien's attention he suggested Plaintiff "share [her] commissions with other employees with gift cards,"

37. Plaintiff gave her first Kitchen Designer over $1,500 in gift cards.

38. In 2015/2016, Plaintiff spent more than $2,000 of her own money on gift cards/coffee and snacks for her coworkers as her store manager stated she should "perk" them

39. When the Store won the first position for sales in 2015, the Market Sales Manager promised she would buy the entire store lunch, but did not.

40. At Mr. O'Brien's suggestion, Plaintiff spent $560 to purchase lunch for her coworkers in place of the Manager.

41. Plaintiff was instructed by Ms. Kimbrell to train another co-worker, Barbara Zavertnick, as a PSI for another store.

42. Plaintiff complied, but her relationship with Ms. Zavertnick turned ugly when Lowe's refused to hire Ms. Zavertnick for the first open PSI position, as Ms. Kimbrell had promised her would happen.

43. Ms. Zavertnick held Plaintiff responsible and actively sought Plaintiff's job thereafter. She stopped supporting the program and even on numerous occasions tried to get Plaintiff in trouble. She pursuantly transferred to another store and still was denied the PSI positions.

44. Plaintiff went 9 months without an office or computer as the store refused to step in and accommodate what was told in writing by corporate for each store to do. Plaintiff still did her job and the West Coast manager flew in from Seattle to find out why she didn't have a dedicated computer that was given to her nor an office. This created more hostility and again Plaintiff requested a transfer or an open PSE position as they made more money. Both were denied.

45. Despite the issues and due to Plaintiffs great success and ability with the program, the Regional Manager, Lee Ann Kimbrell, had her training numerous other PSI that was not part of Plaintiff's job description as well as going to other stores in the Region to "boost their sales." These sales were not tracked on Plaintiff's annual sales as they were separated by store. It was Plaintiff's understanding Ms. Kimbrell did not inform corporate she was doing this. Plaintiff also had to teach Ms. Kimbrell and Ross Reed how to use the programs as neither were aware of how they worked.

46. Plaintiff was awarded a trophy at the January 2016 Regional meeting for her sales accomplishments for Lowe's in 2015.

47. Mr. O'Brien at the annual store meeting in January 2016, made the statement, "Look at what positions can lead to when a waterer becomes the top salesperson for Lowe's."

48. Several coworkers often refused to help her clients and intentionally failed to tell Plaintiff when her customers called or told customers she was unavailable.

49. Despite these setbacks, Plaintiff sold more products for Lowe's than any other PSI or PSE in the region. She was number one in the West Coast and in the top ten in the country.

50. Plaintiff received a score of 98 on her annual performance review.

51. After her performance review, Plaintiff received a $0.17/hour raise.

52. Other PSIs with lower numbers were given a raise of $1.00/hour. Plaintiff's Project Specialist Install Coordinator and Kitchen Designer both received $2.00/hour raises. On information and belief, lower rated PSI employees and non-producing PSI employees were earning more per hour than Plaintiff.

53. When Plaintiff questioned Ms. Romero and Mr. O'Brien about the discrepancies in the raises she was met with hostility and told "SELL MORE!  You should be happy with your commissions!"

54. Plaintiff reported, numerous times, in writing and by telephone to Ms. Kimbrell, that numerous employees refused to support the PSI/PSE Program, did not know anything about the PSI/PSE Program, never held the required weekly reviews of the Program with her, and continually made spiteful comments to her, and were attempting to sabotage projects. Plaintiff believes this was all due to her earnings as a PSI, which were discussed openly among management and staff. Ms. Kimbrell made numerous trips to the store, and on information and belief discussed the matter with Mr. O'Brien.

55. By 2016, Plaintiff was managing up to 30 projects at a time.  Other stores in the Region, including stores in the Denver area, were managing three (3) or six (6) projects at a time.

56. Plaintiff was ordered by Ms. Kimbrell to work at two (2) other Lowe's locations, Westminster and Northglenn, and was expected to service their customers with projects in addition to her customers from the Greeley Store as their numbers were so low.

57. Plaintiff, numerous times, requested applications to transfer out of the Greeley store.

58. Ms. Kimbrell refused to process Plaintiff's transfer requests multiple times.

59. To handle the volume of sales and work Plaintiff was bringing in, Mr. O'Brien hire several Kitchen Designers and Project Coordinators.  The persons hired as Kitchen Designers and as project managers had no construction and/or design qualifications. Plaintiff tried explaining her concerns numerous times with Mr. O'Brien and Ms. Romero, and they were dismissive.

60. Plaintiff requested management to let her assist in future interviews but her request was refused.

61. Plaintiff's closing rate with these new inexperienced employees assisting her went from 86 percent (86%), to less than 40 percent (40%).

62. Plaintiff's closing rate quickly grew to its previous level once they were gone.

63. When Jason Krier was hired as Assistant Store Manager and Plaintiff's direct Supervisor he continued the hostility of the employees and Ms. Romero.

64. Mr. Krier confronted Plaintiff on several occasions, stating she should not be "permitted" to make more money than he makes, regardless of how much product she sells.

65. When Mr. Krier interviewed Theresa Sanders for the position of Kitchen Designer he informed Plaintiff that Ms. Sanders has "RBF". Plaintiff asked what RBF was and he stated: "'Resting Bitch Face', and I don't need two of you with that." Plaintiff has a condition known as Bells Palsey a disability that had given her a left-sided facial droop and is highly self-conscious of this. Plaintiff was very offended by this remark.

66. Plaintiff reported this comment to Ms. Romero, Store Manager Sean O'Brien, and Ms. Kimbrell, but no action was taken and Mr. Krier continued to use this phrase to describe the female kitchen designer and Plaintiff.

67. Due to working at three (3) stores across Colorado, Plaintiff was working seven (7) days a week and, at one point, worked for 148 straight days.

68. Plaintiff applied and requested to be transferred to another store as a Market Sales Manager in 2016.

69. Ms. Kimbrell and Mr. O'Brien told Plaintiff that if she thought their number one sales person could leave for another job at Lowes, they "needed to have a talk."

70. Throughout Plaintiff's employment at Lowes, Plaintiff's co-workers refused to perform their own work if they assisted Plaintiff, refused to call Plaintiff's clients, failed to tell Plaintiff that her clients had called, and refused to help Plaintiff's clients.

71. Plaintiff frequently complained to her supervisors about this treatment, but her co-workers were never disciplined for this behavior.

72. One of Plaintiff's co-workers, Alicia Simms, refused to deal with a number of problems  and was openly hostile to Plaintiff if Plaintiff did not provide her with weekly large "gift cards" as she was told to do by Mr O'Brien.. The regional manager, Lee Ann Kimbrell, and Ross Reed were aware of this.

73. Plaintiff went to Management numerous times with customer complaints concerning Ms. Simms, but Ms. Romero and Mr. O'Brien refused to take any action.

74. Plaintiff learned that Ms. Simms had allowed Lowe's builders to perform work without obtaining the proper building permits for the jobs Plaintiff had sold.

75. Plaintiff was told not to worry about it by Ms. Kimbrell, Mr. Reed and Mr. O'Brien.

76. Plaintiff had also asked, throughout this time, to apply for the PSE position.  She was told "this is not for you," "they make less than you make", and "they earn far less in commissions than you make," and Ms. Kimbrell called them her "boys" and PSIs were the girl group.

77. Plaintiff subsequently learned that PSEs are paid three percent (3%) more in commissions than PSIs are paid, commissions are paid to PSEs one (1) week after the sale, whereas PSIs do not get their commissions until 35 days after the sale, and that the top sales volume by a PSE was only $200,000 less than Plaintiffs' sales volume, yet they made more than Plaintiff due to the higher commission rate for PSEs.

78. Other female employees in other Colorado Lowe's stores who asked to apply for PSE positions were similarly discouraged from applying for PSE positions.

79. All PSEs in Colorado (approximately 30) are male, and almost all PSIs in Colorado (approximately 30) are women.

80. The job requirements published by Lowe's for the two positions are identical, word for word.

81. Ms. Simms and Ross Reid were in charge of contractor oversight.

82. When Plaintiff alerted Mr. Reid and Ms. Simms to issues concerning contractors, she was told to stay out of it.

83. Customers were calling Plaintiff complaining about issues, including but not limited to: Lowe's contract coordinators not performing their jobs, contractors refusing to return customer calls, missing products, dismissal of complaints, project schedules, installations, and missing products on a regular basis, but management ignored her concerns.

84. Additionally, Ms. Simms became more hostile and defiant as Plaintiff attempted to prevent these problems. Ms. Simms openly tried to encourage Plaintiff's transfer to another store as Mr. O'Brien stated if this happened that she could have Plaintiff's job.

85. One customer was upset because wood flooring had been delivered to his driveway, but the delivery persons refused to move the materials into his home. This customer was disabled and could not move the materials himself.

86. When the customer could not get assistance from other Lowe's employees, the builder called Plaintiff at 7:00PM. Plaintiff immediately gathered a crew, went to the job site, and helped the customer move the materials.

87. Plaintiff was written up the next day, supposedly for a bad attitude.

88. During her write-up meeting, Plaintiff was told that her clients may like her but it was her job to make the employees like her, regardless of whether they were lying to

Lowe's customers and damaging Lowe's reputation by their inexperience and poor work habits, and costing Lowe's significant sales.

89. Plaintiff sold a very large remodel project to a client, Ms. Van Matre and her husband. When Plaintiff was doing the final walk-through with Ms. Van Matre, she suggested that Ms. Van Matre purchase a washer and dryer set to compliment the completed project.

90. Plaintiff showed Ms. Van Matre the various options, Van Matre selected the appliances she wanted, then Ms. Van Matre and her husband went to Lowe's and purchased the appliances.

91. After ordering their appliances, the Van Matres went to Plaintiff's office to thank her and to confirm she would get the commission on the sale.

92. Mr. O'Brien and Alicia Simms handled the ordering of the Van Matre's appliances. They told them that the Plaintiff sent them into purchase them.

93. As the new PSIC had closed the Van Matre's account in Project Tool, Plaintiff opened a new account for the Van Matres and entered the sale into Project Tool. This action was consistent with Lowe's training.

94. The following Monday, Plaintiff was taken into a room by two (2) persons from the North Carolina office.

95. When Plaintiff entered the room, they required she turn her cell phone off so that she could not record any part of the conversations.

96. After a long dissertation on stealing and the various ways one can steal from Lowe's they accused Plaintiff of stealing commissions.

97. They held her against her will in the room and made wildly false accusations as to how things were put in Project Tool, the computer application used to track customer projects, and commissions, and that they had all the evidence they needed.

98. They kept her in a small room with three (3) people, two (2) of them interrogating her and demanding she admit that she stole the commissions, without showing her any evidence that any commission theft had even occurred.

99. They implicitly threatened to fire her, or arrest her, and told her if she confessed "there may be another outcome".

100.    This went on for more than one (1) hour, during which time Plaintiff asked several times to show her what commissions she was accused of stealing or let her go, as she needed to leave to meet a customer.

101.    The system used to enter and track sales and commissions makes it impossible for a PSI to "steal" a commission as all commissions have to be approved weekly by management.

102.    Plaintiff did not understand why she was being interrogated.

103.    All commissions Plaintiff earned were approved by her immediate supervisors; Mr. Krier and other store managers. Any questions on commissions were always given to Ms. Kimbrell.

104.    The persons interrogating Plaintiff prevented her from leaving by intimidation, stating that if she left "the outcome could be bad."

105.    One person always stayed in the room when the home office investigators left the room to discuss their next interrogation tactic.

106.    Plaintiff was repeatedly told she could not leave until she admitted the alleged theft.

107.    The interrogators eventually got around to making a specific allegation; that Plaintiff had stolen the commission for a washer and dryer sold to Ms. Van Matre.

108.    During her interrogation, Plaintiff requested the interrogators call Ms. Van Matre to confirm that Plaintiff sold the washer and dryer to the Van Matres. She also informed them that she could show them in Project Tool, and in her paper files, that she sold the washer and dryer to the Van Matres.

109.    The investigators then falsely stated that they had already talked with Ms. Van Matre, implying that Ms. Van Matre had confirmed that Plaintiff stole the commissions.

110.    They again told Plaintiff that she needed to sign a document which stated that she stole the commissions on the washer and dryer, and that she was not threatened or harassed in the interrogations, before she could leave the room. They refused to permit her to read the document despite her repeated requests to review it.

111.    Plaintiff refused to sign the document, stated that she did feel very threatened and harassed, that the allegations they stated were false, and then she wrote her statement to that effect down for the interrogators. She requested a copy but her request was denied.

112.    The two (2) men then left the room. The woman remained in the room and told Ms. Murphy that she could not leave "if you want a better outcome."

113.    Fifteen minutes later, Mr. O'Brien came in and told Plaintiff that she had to sign the document if she wanted to leave.

114.    Again, they refused to let her leave the room, refused to let her read or have a copy of the document, and they, again, tried to force her to sign the document through their intimidating interrogation tactics.

115.    Plaintiff, again, refused to sign the document and the Mr. O'Brien left the room.

116.    Approximately thirty minutes later, Mr. O'Brien came back into the room with Ms. Romero. He handed Plaintiff $2,007 in cash and told her she was fired.

117.    Plaintiff told him she was owed far more than that in commissions and pay; she was also owed vacation and sick leave for one and a half (1.5) years of service.

118.    Ms. Romero told Plaintiff that if the numbers were incorrect she could address it later, but in order for her to leave she needed to sign for the money.

119.    They instructed her to sign a document they represented was a receipt for the cash, but, again, would not let Plaintiff read it. Plaintiff was not given a copy of any of the documents they tried to coerce her into signing

120.    Having been held against her will for more than two (2) hours, Plaintiff signed the document under duress, took the money, and left.

121.    Mr. O'Brien escorted Plaintiff through the Store so that all her co-workers and customers could witness her embarrassment.

122.    Plaintiff humiliated being escorted out.

123.    Plaintiff requested her personal property but was not permitted to retrieve it from her office, not even the trophy she had received for exemplary service to Lowe's less than nine (9) months earlier.

124.    This outrageous process was so disturbing to Plaintiff that she broke down emotionally.

125.    When Ms. Van Matre learned that Plaintiff's interrogators told Plaintiff that they

        had called her and confirmed the alleged commission theft, she was outraged. She

        called Mr. O'Brien and complained that her name had been used, and told Mr.

        O'Brien that the allegations against Plaintiff were false.

126.    Ms. Van Matre requested contact information for the Corporate office so that she

        could lodge a formal complaint, and Mr. O'Brien told her that he would have to call

        her back with that information. He has never called her back.

127.    During that conversation, Mr. O'Brien lied to Ms. Van Matre, stating that he had

        no knowledge of Plaintiff's termination of employment, did not know the date that

        Plaintiff stopped working for Lowe's, did not know why she was gone, and did not

        know how to contact her.

128.    After Plaintiff was forced to take her perp walk, she contacted Theresa Sanders

        about her personal property, including her personal notes concerning projects which

        she had sold and the trophy which she was awarded by Lowe's and her television set.

129.    Ms. Sanders gave Plaintiff's personal property to Ms. Romero, who assured her

        that she was mailing it to Plaintiff that very day.

130.    Plaintiff never received her personal property.

131.    After Plaintiff's termination, when her former customers called Lowe's to speak

        with her, they were told that she just left one day and never returned; no one knew

        where she was or how to contact her; and/or "we don't know what happened to her."

        Some Lowe's employees even told customers that Plaintiff was "fired for doing some

        bad things."

132.     By the time she was wrongfully terminated in November 2016, Plaintiff had sold

more than $2.5 million dollars of Lowe's products and services to Lowe's customers.

133.     After Plaintiff was fired, she was contacted by Assistant Manager Randy Miller of

the Westminster Store to help him close out a project she had sold for that store.

134.     Mr. Miller informed Plaintiff that this action was approved by Ms. Kimbrell;

however, Plaintiff was not paid for her time, or even offered reimbursement for

driving to North Westminster and the customer's home, and then back to Fort Collins.

135.     Plaintiff filed a charge of discrimination with the EEOC on or about January 17,

2017, and has requested a notice of right to sue. On information and belief, the Notice

of Right to Sue has been issued by the EEOC, but has not yet been received by

Plaintiff.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF
(Sex Discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended)

136.     The foregoing allegations are realleged and incorporated herein by reference.

137.     At all relevant times, Defendant has been an "employer" within the meaning of

Title VII.

138.     At all relevant times, Defendant has employed "employees," including Plaintiff,

within the meaning of Title VII. Ms. Murphy was an employee of Defendant within

the meaning of Title VII from April 2015 to November 2016.

139.     Plaintiff filed a charge of discrimination with the EEOC on or about January 17,

2017, and has requested a notice of right to sue. On information and belief, the Notice

of Right to Sue has been issued by the EEOC, but has not yet been received by

Plaintiff.

140.    As a result of the foregoing conduct, as alleged, Defendant has violated Title VII. These violations were committed knowingly, willfully and with reckless disregard of applicable law.

141.    Defendant subjected Plaintiff to less favorable terms and conditions of her employment based on sex as described in this Complaint, including but not limited to: failing to allow Plaintiff to apply for and/or failing to promote Plaintiff to PSE positions, subjecting Plaintiff to hostile, sex-based comments, and Plaintiff's termination.

142.    Defendant's conduct constitutes unlawful discrimination against Plaintiff on the basis of her sex in violation of 42 U.S.C. § 2000e-2(a) of Title VII.

143.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

## SECOND CLAIM FOR RELIEF
(Violation of the Equal Pay Act)

144.    The foregoing allegations are realleged and incorporated herein by reference.

145.    At all relevant times, Defendant has been an "employer" within the meaning of the Equal Pay Act.

146.    At all relevant times, Defendant has employed "employees," including Plaintiff, within the meaning of the Equal Pay Act. Ms. Murphy was an employee of Defendant within the meaning of the Equal Pay Act from April 2015 to November 2016.

147.    As a result of the foregoing conduct, as alleged, Defendant has violated the Equal Pay Act. These violations were committed knowingly, willfully and with reckless

disregard of applicable law.

148.     Defendant subjected Plaintiff to less favorable terms and conditions of her pay based on sex as described in this Complaint, including but not limited to: failing to allow Plaintiff to apply for and/or failing to promote Plaintiff to PSE positions, and failing to allow women to apply for/and or failing to promote women to PSE positions.

149.     PSE and PSI positions are identical, but all PSE positions in Lowe's Colorado stores are held by men, PSEs (men) are paid three percent (3%) more in commissions than PSIs (women) for all the products they sell, even when the products sold are the same.

150.     Defendant's conduct constitutes unlawful pay discrimination against Plaintiff on the basis of her sex in violation of the Equal Pay Act.

151.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

### THIRD CLAIM FOR RELIEF
(False Imprisonment in Violation of Colorado Law)

152.     The foregoing allegations are realleged and incorporated herein by reference.

153.     Defendant intentionally restrained Plaintiff's freedom when it confined Plaintiff to a small room in early November 2016 for nearly three (3) hours and refused to let Plaintiff leave until she confessed to a crime and/or signed documents acknowledging her alleged crime and/or releasing Defendant of liability.

154.    Plaintiff was aware that her freedom of movement was restricted, and asked

repeatedly to leave.

155.    Defendant's conduct constitutes unlawful false imprisonment against Plaintiff in

violation of Colorado law.

156.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered

damages, including diminished reputation and other pecuniary losses, and emotional

pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and

other non-pecuniary losses.

157.    Plaintiff is additionally entitled to exemplary damages for Defendant's actions

and/or omissions which were willful, wanton, reckless, malicious, oppressive and/or

done with a conscious or reckless disregard for Plaintiff's rights.

### FORTH CLAIM FOR RELIEF
(Defamation in Violation of Colorado Law)

158.    The foregoing allegations are realleged and incorporated herein by reference.

159.    Defendant's employees communicated false and damaging statements to

customers when customers called to speak with Plaintiff after her termination,

including, but not limited to, that Plaintiff had been fired for theft.

160.    Defendant's employees also communicated false and damaging statements to

Plaintiff's co-workers and various local contractors, who in turn shared this false

information to Plaintiff's customers, severely damaging Plaintiff's reputation and

future employment prospects in the area.

161.    Defendant's conduct constitutes unlawful defamation against Plaintiff in violation

of Colorado law.

162.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered

damages, including diminished reputation and other pecuniary losses, and emotional

pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and

other non-pecuniary losses.

## FIFTH CLAIM FOR RELIEF
(Intentional Infliction of Emotional Distress in Violation of Colorado Law)

163.    The foregoing allegations are realleged and incorporated herein by reference.

164.    Defendant engaged in conduct with the purpose of causing severe emotional

distress to Plaintiff when it: forced Plaintiff to push an extremely heavy hand card

while permitting other employees to use powered lifts for the same task, causing

Plaintiff to experience a heart attack and then criticizing Plaintiff for leaving work to

go to the hospital; repeatedly informed Lowe's employees of Plaintiff's high

commission earnings, intentionally alienating her from her co-workers; lied to

Plaintiff's customers and co-workers about the circumstances of her termination,

telling them that she had abandoned her job, did not show up for work, could not be

reached, etc.; refused to investigate Plaintiff's assertions that the alleged theft could

be shown to be false simply by examining the database and/or speaking to the

customer; refused to permit Plaintiff to take her personal property with her upon her

termination; refused to permit Plaintiff to apply for the male-only PSE position;

refused to pay the same commission rate to women;

165.    Defendant's conduct constitutes intentional infliction of emotional distress against

Plaintiff in violation of Colorado law.

166.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered

damages, including diminished reputation and other pecuniary losses, and emotional

pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

WHEREFORE, Plaintiff Shannon Murphy respectfully requests that this Court enter judgment in her favor and against Defendant and order the following relief as allowed by law:

A.  Compensatory damages, including but not limited to those for emotional distress, inconvenience, mental anguish, and loss of enjoyment of life;

B.  Back pay and benefits;

C.  Injunctive and/or declaratory relief;

D.  Attorney fees and costs of the action, including expert witness fees, as appropriate;

E.  Pre-judgment and post-judgment interest at the highest lawful rate; and

F.  Such further relief as justice allows.

**<u>PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE</u>**

Respectfully submitted July 14, 2017

By:

<u>/s/Kelli Riley</u>
Kelli R. Riley, Esq.
Riley Law LLC
2005 W. 9th Street, Suite 6
Greeley, CO 80631
Telephone: (970) 301-1350
kelli@rileylawllc.com

<u>/s/ James W. Schmehl</u>
Schmehl Law Group P.C.
219 West Magnolia
Fort Collins, CO 80521
Telephone: (970) 484-0225
E-mail: jwslaw@frii.com
ATTORNEYS FOR PLAINTIFF